b

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

CHARLOTTE CORLEY BRIGGS,
Plaintiff

CIVIL DOCKET NO. 1:24-CV-01412

VERSUS

MAGISTRATE JUDGE PEREZ-
MONTES

U S COMMISSIONER OF SOCIAL
SECURITY,
Defendants

---

MEMORANDUM RULING

Before the Court is an appeal by Charlotte Corley Briggs ("Briggs") from the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Title II Social Security disability benefits. ECF No. 1.

Because the final decision of the Commissioner is supported by substantial evidence and no legal error was committed, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the final decision of the Commission is AFFIRMED, and Briggs's appeal (ECF No. 1) is DENIED and DISMISSED WITH PREJUDICE.

I.    Background

A.    Procedural History

Briggs previously filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("SSA") and a Title XVI application for supplemental security income, alleging a disability onset date of December 22, 2016. ECF No. 7-1 at 90. An administrative law judge ("ALJ")

1

determined Briggs was not disabled from December 22, 2016, through February 21, 2019. *Id.* at 87–99. That decision was upheld by the Appeals Council. *Id.* at 105–08.

On November 8, 2021, Briggs filed a second application for a period of disability and disability insurance benefits under Title II of the SSA, again alleging a disability onset date of December 22, 2016. *Id.* at 15. Briggs's claim was denied initially and upon reconsideration. *Id.* at 126–34. Briggs requested a hearing. *Id.* at 135–36.

An ALJ convened a *de novo* hearing. *Id.* at 29–45. Briggs, her attorney, and a vocational expert ("VE") were present. *Id.* at 29. The ALJ ultimately found that Briggs was not under a disability within the meaning of the SSA from December 22, 2016, the alleged onset date, through December 31, 2022, the date last insured. *Id.* at 16. The Appeals Council declined Briggs's request to review the ALJ's decision, *see id.* at 5–8, and the ALJ's decision became the final decision of the Commissioner.

Briggs appealed the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). ECF No. 1. Briggs argues the ALJ erred in finding that (1) she did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (2) she had the residual functional capacity to perform light work; (3) there were jobs that existed in the significant numbers in the national economy that she could perform; and (4) she was not under a disability at any time through December 16, 2016, and December 31, 2022. ECF No. 8 at 2–3.

### B. Medical Records

From October 10, 2008, to March 29, 2016, Briggs periodically received injections from Dr. Stephen Rice, M.D., ("Dr. Rice") to treat pain in her lower back, hip, and/or right leg and numbness in her legs or right foot. ECF No. 7-1 at 326–337. Dr. Rice diagnosed Briggs with displacement of a lumbar intervertebral disc without myelopathy. *Id.* at 330.

In 2016, Briggs met with Dr. Robert J. Freedman, Jr., M.D., ("Dr. Freedman") on three occasions. On October 4, Briggs complained of anxiety attacks, extreme stress, and back pain. *Id.* at 64. Dr. Freedman approved a leave of absence because of her "back injury and need for specialized exercise." *Id.* at 66. On November 10, Briggs reported that she was "extremely nervous." *Id.* at 57. Briggs received a stress echocardiogram, which indicated she had a good exercise tolerance for her age, her left ventricular systolic function was normal, and her basal septal segment was moderately hypokinetic with exercise. *Id.* at 61. Finally, on December 22, Briggs complained of fatigue, palpitations, and back, arm, and leg pain. *Id.* at 54.

On October 30, 2017, Briggs met with Dr. Amy Barilleaux Griffin, M.D., ("Dr. Griffin"). *Id.* at 603-04. She complained of hand, feet, and lower back pain. *Id.* at 603.

On April 13, 2018, Briggs returned to Dr. Rice and complained of pain in her lower back that radiated down her legs. *Id.* at 339. Dr. Rice diagnosed her with other spondylosis with radiculopathy in the lumbar region. *Id.* He gave her an injection. *Id.*

On May 15, 2018, Dr. Freedman represented that he had treated Briggs for fatigue and palpitations and diagnosed her with hyperlipidemia and paroxysmal

atrial fibrillation. *Id.* at 51. Dr. Freedman additionally represented that Briggs had previously been diagnosed with and treated for a severe vitamin B-12 deficiency. *Id.* Dr. Freedman opined that Briggs's medical conditions would continue to worsen, and she would be unable to work in the future. *Id.*

On November 19, 2018, Briggs returned to Dr. Griffin to complain of left shoulder and neck pain. *Id.* at 600. Briggs also reported that she had "thoracic back region discomfort" and "intermittent numbness" of her left hand. *Id.* Dr. Griffin diagnosed her with cervicalgia. *Id.* at 601.

On December 4, 2018, Briggs received magnetic resonance imaging ("MRI") of her cervical spine. *Id.* at 383–86. The MRI indicated mild circumferential disc bulging at the C3-4; degenerative facet changes on the left C4-5 with uncinate process osteophyte and moderate left-sided foraminal narrowing; disc space narrowing at the C5-6 with broad-based left disc bulge into the foramen with severe left foraminal narrowing the right foramen; and a broad-based central disc bulge and some circumferential disc bulging with left-sided foraminal narrowing at the C6-7. *Id.* at 383–84.

On December 13, 2018, Dr. Gregory Dowd, M.D. ("Dr. Dowd") examined Briggs and her MRI. *Id.* at 319–20. Dr. Dowd diagnosed Briggs with cervical stenosis. *Id.* at 319. He further opined that lumbar radiculopathy and chronic stenosis with a herniated disc were causing her back and right leg pain. *Id.* Dr. Dowd attributed Briggs's neck and left arm pain to radiculopathy. *Id.* He opined that she could possibly develop "neurologic dysfunction or pain with functional limitation." *Id.*

On January 2, 2019, Briggs returned to Dr. Rice and complained of pain in her right hip and leg. *Id.* at 321. Dr. Rice gave her an injection. *Id.*

On February 11, 2019, Briggs complained to Dr. Griffin of anxiety and macromastia. *Id.* at 430. Dr. Griffin prescribed Wellbutrin. *Id.* at 431.

On February 22, 2019, Briggs met with Mike Brandao, C.F.N.P., ("Nurse Brandao") and complained that her back, buttocks, and leg pain had worsened over the last year. *Id.* at 360. That same day, Dr. Pierce D. Nunley, M.D., ("Dr. Nunley") diagnosed Briggs with herniated nucleus pulposus at the L4-L5 with extrusion and inferior migration on the left with left L5 radiculopathy; herniated nucleus pulposus at the L4-L5 on the right with inferior migration; and stenosis at the L4-L5 with bilateral neurogenic claudication. *Id.* at 364.

On March 6, 2019, Dr. Nunley reviewed an MRI and observed a broad-based disc bulge at the L3-L4; large broad-based disc bulge with disc herniation and moderate subarticular stenosis at the L4-L5; and degenerative disc disease, facet hypertrophy with mild subarticular stenosis, and mild neural foraminal stenosis at the L5-S1. *Id.* at 355. He noted that a large right-sided disc herniation had not been present in previous MRIs. *Id.* at 356. Briggs consented to surgery. *Id.* at 357. On March 22, Dr. Nunley performed a laminectomy. *Id.* at 354, 367–68.

Briggs followed up with Nurse Brandao after her surgery. On April 3, 2019, Briggs reported that she still had back pain, but her pain level had decreased from a nine out of ten to a two out of ten. *Id.* at 352. On May 15, Briggs rated her back, buttock, and leg pain as a one out of ten. *Id.* at 350. She rated the pain on the left side

of her neck, left shoulder, and left arm as a four out of ten. *Id.* Briggs also reported numbness in her right lower extremity. *Id.* Nurse Brandao observed Briggs to be in mild-to-moderate distress because of her pain. *Id.*

On April 11, and June 6, 2019, Briggs attended physical therapy with William Prestridge, P.T., ("Prestridge"). *Id.* at 375–81. On April 11, Briggs complained of back pain and numbness in her right foot. *Id.* at 378. She rated her lumbar pain as a one out of ten. *Id.* She reported that her right hip and right thigh pain had improved, rating her pain as a five out of ten. *Id.* She additionally reported moderate limitations in her walking, daily living activities, and sitting. *Id.* On June 6, she reported the same pain levels and same limitations. *Id.* at 375.

Also in 2019, Briggs received six chiropractic adjustments from Dr. Kemp J. Nelson, D.C., ("Dr. Nelson"). *Id.* at 631–36. During her visits, Briggs complained of neck, arm, and shoulder pain, and she occasionally complained of headaches. *Id.* On at least one occasion, Briggs reported that her pain symptoms were improving. *Id.* at 635.

On September 20, 2019, Briggs returned to Dr. Griffin, complaining that she was "feeling very anxious." *Id.* at 428. Dr. Griffin increased her Wellbutrin dosage. *Id.* at 429. On October 28, 2019, Briggs followed up with Dr. Griffin and reported that she was "feeling better." *Id.* at 425.

On December 17, 2019, Briggs complained to Dr. William Crenshaw, M.D., ("Dr. Crenshaw") of a constant "sharp and shooting" pain in her left knee. *Id.* at 397. Dr. Crenshaw ordered an MRI. *Id.* at 399. Briggs received an MRI of her left knee on

December 20, which indicated a horizontal tear to her lateral meniscus with lateral paramediastinal cysts. *Id.* at 410.

On December 26, 2019, Briggs complained to Jeanne Harrison, N.P., ("Nurse Harrison") of an occasional dull pain in her left knee. *Id.* at 402. Briggs consented to a knee arthroscopy with meniscectomy, and on December 31, Dr. Crenshaw performed the surgery. *Id.* at 402, 411–12.

On January 7, 2020, Briggs followed up with Nurse Harrison after her knee surgery. *Id.* at 400–01. Briggs complained of swelling and pain in her left knee but reported that Tylenol relieved her symptoms. *Id.* at 400. Nurse Harrison noted that Briggs had a good range of motion and did not observe any swelling. *Id.* On February 4, Briggs complained to Dr. Crenshaw of stiffness, swelling, and minimal pain following her surgery. *Id.* at 395.

Between April and May 2020, Briggs received thirteen chiropractic adjustments from Dr. Nelson. *Id.* at 637–49. Briggs generally complained of shoulder, shoulder blade, neck, arm, and hand pain. *Id.* She also occasionally reported numbness and tingling in her left arm and in the fingers of her left hand and sleeping issues. *Id.* at 638, 640, 642–44, 646–49. Briggs reported on several occasions that her pain symptoms had improved. *Id.* at 639, 641–43, 645–46.

Briggs received three chiropractic adjustments in April 2021 and four chiropractic adjustments in September 2021 from Dr. Nelson. *Id.* at 650–56. Briggs generally complained of pain and tightness in her neck, back, and/or shoulder blades.

*Id.* She occasionally complained of headaches. *Id.* at 650–51, 653. Briggs reported on several occasions that her symptoms had improved. *Id.* at 651–52, 655–56.

Between January and February 2022, Briggs received eight chiropractic adjustments from Dr. Nelson. *Id.* at 657–64. As with her previous visits, Briggs complained of neck, back, and shoulder blades pain and headaches. *Id.* On one visit, Briggs complained of tingling and numbness in the fingers of her left hand. *Id.* at 663. On some visits, Briggs reported that her symptoms had improved. *Id.* at 658, 662, 664.

On April 11, 2022, Briggs returned to Dr. Griffin's office and complained of macromastia and back and neck pain. *Id.* at 587. Briggs also reported that she was experiencing anxiety because of "some family health issues." *Id.*

On May 30 and June 3, 2022, Briggs received chiropractic appointments from Dr. Nelson. *Id.* at 665–66. She complained of neck and shoulder blades pain and numbness in her hands. *Id.*

In August 2022, Briggs met with Dr. Freedman twice and complained of leg pain. *Id.* at 447–49, 574–76. Dr. Freedman completed an electrocardiogram on August 2. *Id.* at 576. He recommended that Briggs remain active and continue taking her current medications. *Id.* at 449, 576.

On January 5, 2023, Briggs met with Dr. Griffin again. *Id.* at 584. She complained of neck pain, paresthesia in her right hand, and macromastia. *Id.*

On August 16, 2023, Briggs complained to Dr. Freedman of leg pain, palpitations, and fatigue. *Id.* at 451–52. On August 30, Briggs received an

8

echocardiogram. *Id.* at 462–64. Dr. Freedman observed mild concentric left ventricular hypertrophy, trace mitral regurgitation, trace tricuspid regurgitation, and mildly elevated right ventricular systolic pressure. *Id.* at 462. Briggs had a normal strain pattern. *Id.* at 463.

On October 26, 2023, Briggs received a dobutamine stress echocardiogram. *Id.* at 459–61. Dr. Freedman noted that Briggs had "a good exercise tolerance for age," and he did not observe any "diagnostic ST-T wave changes" "[i]n response to stress." *Id.* at 459. He additionally observed "[n]ormal blood pressure and heart rate responses to stress." *Id.* He found no evidence of active ischemia. *Id.*

On October 31, 2023, Briggs met with Dr. Freedman again. *Id.* at 455. Briggs denied having any cardiac complaints at that time. *Id.*

On March 19, 2024, Dr. Freedman stated Briggs had been under his care for atrial fibrillation, hypertension, and hyperlipidemia. *Id.* at 68. He noted that her heart conditions were aggravated by stress. *Id.* He opined that if Briggs were to return to work, "any mental or physical stress would exacerbate her anxiety and worsen her heart condition." *Id.* Therefore, he concluded that Briggs could not work. *Id.*

On June 28, 2024, Dr. Freedman opined that Briggs's "episodes of atrial fibrillation and supraventricular tachycardia have increased over the years making her incapable of work." *Id.* He further opined that Briggs was "unable to stand or sit for an extended time of greater than one hour making it impossible to return to work." *Id.*

C. <u>Administrative Hearing</u>

At her administrative hearing, Briggs testified she worked as an elementary school teacher until she started to have more frequent atrial fibrillation episodes. ECF No. 7-1 at 32–33. Briggs testified that Dr. Freedman advised her to not work because the stress of working in a classroom or another job would be "too much" for her "heart to handle" and would "increase [her] episodes." *Id.* at 38.

Regarding her limitations, Briggs testified that she could only stand for a few minutes in one position and could sit for approximately an hour. *Id.* at 33. She testified that her heart rate would "be[] in afib," two to three times a week, which would cause her to "be really exhausted and tired." *Id.* at 34. The episodes could last several hours, and it would take her a "couple hours" to recover. *Id.* Briggs stated that she was able to drive and could carry light bags. *Id.* at 35. But her "back and knee" issues prevented her from walking for a long period of time or doing cardiovascular activities. *Id.* She additionally reported that she had difficulty sleeping and would usually only be able to sleep for "a couple hours at a time." *Id.* at 40.

Briggs testified she was not taking any prescribed pain medication. *Id.* at 34. She further testified that she had been trying different heart medications, but none had worked. *Id.* at 34–35. She received massage therapy for her back, which alleviated her symptoms temporarily. *Id.* at 36. Briggs further testified that she had "cervical issues of the neck and the lower back," "nerve damage to [her] right leg and [her] right foot," and had had back surgery. *Id.* at 37. The back surgery "did help

10

alleviate the pain," but she still had nerve damage. *Id.* She testified that post-surgery physical therapy helped get her back to her "baseline." *Id.*

The ALJ then examined the VE. *Id.* at 42–44. The ALJ posed a hypothetical for someone of Briggs's age, education, and work experience who could lift and carry 20 pounds occasionally and ten pounds frequently, could stand and walk for six hours, could sit for six hours, and was limited to simple work involving only incidental contact with others. *Id.* at 42. The VE testified that this hypothetical individual could not perform Briggs's past relevant work but could complete light, unskilled work as a housekeeping cleaner or bottling line attendant. *Id.* at 43.

The ALJ then posed a second hypothetical for someone of Briggs's age, education, and work experience who had unpredictable "heart rate episodes resulting in exhaustion, which occur two to three times a week and can last up to four hours." *Id.* The VE testified that this hypothetical individual would not be able to work. *Id.* The ALJ then modified that hypothetical to an individual who had unpredictable heart rate episodes three to four times a month. *Id.* The VE testified that this individual would not be able to work. *Id.*

Briggs's attorney then posed a hypothetical for someone of Briggs's age, education, and work experience who could only stand for an hour and sit for an hour. *Id.* at 44. The VE testified that this individual would not be able to work. *Id.*

### D. ALJ's Findings and Conclusions

The SSA promulgated a five-step sequential process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a). This process requires the ALJ to

determine whether a claimant (1) is engaging in substantial gainful activity; (2) has a medically determinable severe impairment or a combination of impairments that is severe; (3) has an impairment or combination of impairments listed in or medically equivalent to those listed in Appendix 1; (4) has the residual functional capacity to perform her past relevant work; and (5) has the residual functional capacity, age, education, and work experience to perform any other type of work. 20 C.F.R. § 404.1520(a)(4)(i)–(v).

A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)). To be entitled to benefits, an applicant bears the initial burden of showing she is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. *See Greenspan*, 38 F.3d at 237.

Here, the ALJ found that Briggs had not engaged in substantial gainful activity from February 22, 2019, through December 31, 2022, the date last insured. ECF No. 7-1 at 18. The ALJ further found that Briggs had the following severe impairments: disc protrusions in the cervical spine; herniated nucleus pulposus and stenosis in the lumbar spine, status post-surgical repair; left knee meniscus tear, status post-surgical repair; atrial fibrillation; and anxiety. *Id.* But the ALJ found Briggs did not have an impairment or combination of impairments that met or

12

medically equaled the severity of one of the listed impairments in Appendix 1. *Id.* at 18–19.

The ALJ then found that Briggs had the residual functional capacity to perform light work except that she could stand and/or walk 6 hours in an 8-hour workday; she could sit 6 hours in an 8-hour workday; she could lift and/or carry 10 pounds frequently and 20 pounds occasionally; she could perform simple work only; and she could have only incidental contact with others. *Id.* at 20. At Step Four, the ALJ determined that Briggs did not have the residual functional capacity to perform her past relevant work as an elementary school teacher. *Id.* at 23. At Step Five, the ALJ considered Briggs's age, education, work experience, and residual functional capacity and determined that Briggs could perform jobs that exist in significant numbers in the national economy, such as a housekeeping cleaner or bottling line attendant. *Id.* at 23–24.

Accordingly, the ALJ concluded that Briggs was not under a disability as defined in the SSA from December 22, 2016, through December 31, 2022, the date last insured. *Id.* at 24.

## II.    Law and Analysis

### A.  Scope of Review

A court's review of social security disability claims is "exceedingly deferential and limited to two inquiries: whether substantial evidence supports the ALJ's decision, and whether the ALJ applied the proper legal standards when evaluating

the evidence." *Boone v. O'Malley*, No. 23-CV-40401, 2023 WL 9018388, at *1 (5th Cir. 2023) (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)).

"When substantial evidence supports the ALJ's findings, these findings 'shall be conclusive' and must be affirmed." *Daigle v. Kijakazi*, No. 22-CV-30721, 2023 WL 4501865, at *1 (5th Cir. 2023) (citing 42 U.S.C. § 405(g)). For the evidence to be substantial, it must be "more than a scintilla and less than a preponderance," and "of such relevance that a reasonable mind would accept it as adequate to support a conclusion." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

"[T]he substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision. [The Court] must consider the record as a whole, and the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986). A court reviewing the Commissioner's decision "may not retry factual issues, reweigh evidence, or substitute [its] judgment for that of the fact finder." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983); *see also Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Daigle*, 2023 WL 4501865, at *1.

A court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. *See Dellolio*, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See *Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

### B.  Substantial Evidence Supports the ALJ's Findings.

#### i.  Step Three Finding

The ALJ determined Briggs did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1. ECF No. 7-1 at 18. Briggs argues this determination is inconsistent with the ALJ's findings that she cannot perform her past relevant work as a school teacher and that she has severe impairments. ECF No. 8 at 3–5. But this argument rests on a conflation of several steps of the ALJ's disability determination process. Whether an impairment is severe or she can perform her past relevant work are discrete issues from whether an impairment or combination thereof meets or medically equals an impairment listed in Appendix 1. Thus, even though Briggs's impairments are severe and prevent her from performing her past relevant work, those same impairments are not necessarily "equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

In his analysis, the ALJ considered several listed impairments and the relevant criteria before determining that Briggs's impairments did not meet or medically equal a listed impairment. ECF No. 7-1 at 18–19. Briggs does not direct the

15

Court to any specific listed impairment that she believes her impairments meet or medically equal. Nor does she identify any legal error with the ALJ's analysis. It is not this Court's role to reweigh the evidence. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). The ALJ adequately articulated his reasons for finding that Briggs's impairments did not meet or medically equal a listed impairment. That finding is proper and adequately supported by substantial evidence.

### ii. Residual Functional Capacity Finding

The ALJ determined that Briggs had the residual functional capacity to perform light work with some restrictions. ECF No. 7-1 at 20. Briggs argues this finding was erroneous because of her frequent atrial fibrillation episodes and "the impairments associated with her cervical spine, lumbar spine[,] and left knee." ECF No. 8 at 5.

However, the ALJ's decision is supported by substantial evidence, and he did not commit legal error in that analysis. The ALJ considered each medical opinion, the medical evidence, Briggs's testimony, and a third-party function report completed by Briggs's husband. ECF No. 7-1 at 20–23. Where applicable, the ALJ made credibility choices. For example, the ALJ found that Dr. Freedman's opinion that Briggs could not work was unpersuasive because it was neither consistent with the medical record nor supported by his own medical notes. *Id.* at 21. The ALJ further found that Briggs's testimony regarding the intensity, persistence, and limiting effects of her symptoms was not consistent with the medical evidence and other evidence in the record. *Id.* at 22.

In making these credibility decisions, the ALJ applied the proper regulatory framework. Notably, Briggs does not identify any discrete issue or legal error with the ALJ's decision-making process, apparently taking issue only with the result. But again, the Court's role is not to reweigh the evidence. *See Perez*, 415 F.3d at 461. Further, the resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, not this Court. *See Allen*, 642 F.2d at 801; *Daigle*, 2023 WL 4501865, at *1. The ALJ articulated his reasons for finding that Briggs could perform light work. That finding is proper and adequately supported by substantial evidence.

### iii.  Step Five Finding

The ALJ determined that there existed jobs in significant numbers in the national economy that Briggs could perform. ECF No. 7-1 at 23–24. Briggs argues this finding was erroneous because the VE's testimony and medical evidence establishes that she cannot work with her frequent atrial fibrillation episodes and inability to stand and sit for more than an hour. ECF No. 8 at 6–7.

But "[i]t is well-settled that an ALJ is not bound by vocational expert testimony which is based upon hypothetical assumptions that are rejected by the ALJ." *Shumock v. Astrue*, No. 12-CV-520, 2013 WL 1289160, at *11 (W.D. La. Mar. 1, 2013), *report and recommendation adopted*, No. 12-CV-520, 2013 WL 1289159 (W.D. La. Mar. 26, 2013). As explained above, the ALJ found Dr. Freedman's opinions about Briggs's limitations unpersuasive and similarly found Briggs's testimony about her limitations inconsistent. ECF No. 7-1 at 21–23. Thus, the ALJ rejected the

hypothetical assumptions now relied on by Briggs, and he was not bound by those assumptions when determining that there were jobs Briggs could perform. The ALJ's finding is proper and is adequately supported by substantial evidence.

### iv. Disability Finding

The ALJ ultimately determined that Briggs was not under a disability at any time from December 22, 2016, through December 31, 2022. ECF No. 7-1 at 24. Briggs argues this finding was erroneous because "[t]he facts and opinions demonstrated in this record make it clear that [she] has been under a disability since December of 2016." ECF No. 8 at 7. Again, however, the Court's role is not to reweigh evidence, resolve conflicting evidence, or make credibility decisions. *See Perez*, 415 F.3d at 461; *Allen*, 642 F.2d at 801; *Daigle*, 2023 WL 4501865, at *1. That is exactly what Briggs asks the Court to do here.

A review of the claim here demonstrates both that substantial evidence supports the ALJ's decision and that the ALJ applied the proper legal standards. The record indicates that Briggs's impairments are not as limiting as she claims and that she can perform light work with the restrictions identified by the ALJ. Accordingly, the ALJ's findings, including the ultimate disability determination, are "'conclusive' and must be affirmed." *Daigle*, 2023 WL 4501865, at *1 (citing 42 U.S.C. § 405(g)).

## III. Conclusion

Because the final decision of the Commissioner is supported by substantial evidence and no legal error was committed, IT IS HEREBY ORDERED, ADJUDGED,

18

AND DECREED that the final decision of the Commission is AFFIRMED, and

Briggs's appeal (ECF No. 1) is DENIED and DISMISSED WITH PREJUDICE.

SIGNED on Wednesday, April 1, 2026.

_____
JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE

19